**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DARRELL DAVIS,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:10-CV-958-P-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u>

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Appellant's Brief* (doc. 15), filed October 27, 2010, and *Defendant's Motion for Summary Judgment* (doc. 16), filed November 22, 2010. Based on the relevant filings, evidence, and applicable law, Defendant's motion should be **GRANTED** and the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.    <u>Procedural History</u>

Plaintiff Darrell Davis ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title VI of the Social Security Act. On March 31, 2007, Plaintiff applied for supplemental security income, alleging disability since March 28, 2007, due to depression and a steel plate in his left leg and arm. (R. at 16, 78-81, 146.) His application was denied initially and upon reconsideration. (R.

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

at 78-81, 86-88.) He timely requested a hearing before an Administrative Law Judge ("ALJ"), and personally appeared and testified at a hearing held on March 24, 2009. (R. at 94-95, 29-30.) On June 5, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 13-25.) Plaintiff then requested the Appeals Council to review the ALJ's decision in light of newly submitted evidence. (R. at 4-12.) On March 15, 2010, the Appeals Council denied his request for review, and the ALJ's decision became the final decision of the Commissioner. (R. at 4.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.** **Factual History**

**1.** **Age, Education, and Work Experience**

Plaintiff was born on December 14, 1962, was forty-four years old on his alleged onset date, and was forty-five years old at the time of the hearing before the ALJ. (R. at 24.) He has a tenth grade education, (R. at 220), and past relevant work as a landscape laborer, (R. at 23).

**2.** **Medical Evidence**

Although Plaintiff has a history of physical impairments in his left ankle and wrist, the relevant medical evidence for review purposes concerns his alleged bipolar disorder.

**a. Evidence Before the ALJ**

On August 7, 2007, Grant Hellyer, Psy.D., evaluated Plaintiff. (R. at 207.) He noted that Plaintiff had been treated for depression four or five years earlier but was not then receiving any psychiatric treatment. (*Id.*) He noted that Plaintiff cared for his personal hygiene, dressed himself, read the Bible, watched television, fed the dog, heated food in the microwave, talked to his brother, occasionally attended church, and visited and ate out with his friends on average twice a month. (R. at 207-08.) He did not do any cooking; his brother did the laundry. (R. at 208.) Dr. Hellyer noted

that Plaintiff's appetite was good, his weight had been steady, and he denied overeating. (*Id.*) He slept an average of eight hours a day, his motor movements were normal, his mood was euthymic, his manner was friendly and cooperative, and he was talkative. (R. at 208.) Plaintiff stated that he felt depressed sometimes because of all he had been through, but never had suicidal thoughts. (*Id.*) When asked about auditory hallucinations, he claimed that he sometimes heard his name called when he lived on the streets, but he did not hallucinate otherwise. (*Id.*) He counted backwards from twenty slowly and correctly, could not spell the word "world" forwards, and could repeat four of five digits forward. (*Id.*) His general knowledge was a little below average, he could generalize from a proverb and categorize, and his comprehension was normal. (*Id.*) He immediately recalled three objects, and two of three after five minutes, which was normal for his age. (*Id.*) Dr. Hellyer noted that Plaintiff was preoccupied with somatic concerns and there was not "sufficient evidence of symptoms of a depressive disorder." (*Id.*)

On March 13, 2009, about two weeks before the hearing, Plaintiff saw Juana Acosta, a qualified mental health professional at Dallas Metrocare with complaints of depression, anxiety, paranoia, abnormally high energy with decreased need for sleep, mood swings, irritability, sleep problems, low energy, amotivation, anhedonia, helplessness and hopelessness, with symptoms lasting weeks at a time. (R. at 255.) Ms. Acosta noted that Plaintiff had occasional suicide thoughts with no plan or intent and had not attempted suicide. (*Id.*) According to her, there was "evidence of deterioration in some interactions with others, with increased incidence of arguments, hostility or conflict", but Plaintiff was still able to maintain some meaningful and satisfying relationships during the previous ninety days. (*Id.*) She diagnosed him with "bipolar disorder, most recent episode depressed, severe with psychotic features." (*Id.*) During the psychiatric diagnostic interview exam that same day, it was noted that Plaintiff had no psychiatric hospitalizations but had

previously been diagnosed with depression. (R. at 258-59.) He exhibited normal behavior, normal speech, normal psychomotor skills, fair judgment and insight, intact memory, normal attention, and no sign of psychotic features, and had eight hours of fragmented sleep a day. (R. at 259.) Plaintiff was placed on mood stabilizers. (R. at 260.)

On March 23, 2009, J. Salome Acosta, a qualified mental health professional and case worker at Dallas Metrocare stated in a one-page letter that Plaintiff was a client of Dallas Metrocare Psych Services and was seen on a monthly basis. (R. at 252.) She stated that Plaintiff had been diagnosed with Bipolar I, most recent episode depressed, severe with psychotic features, and had been prescribed Zoloft and Lithium Carbonate. (*Id.*)

### b. *Evidence Before the Appeals Council*

Psychologist Douglass Bellamy, Ed.D., evaluated Plaintiff twice in August of 2009. (R. at 267.) He noted that Plaintiff had experienced racing thoughts since childhood, depression after his work slowed down, and mood swings and anxiety attacks. (R. at 266.) He also noted that Plaintiff had a fear of going outside as a teenager and still felt that way off and on. (*Id.*) He diagnosed him with bipolar disorder II, noting that it appeared "to be long standing, dating perhaps to childhood, when he reported having 'racing thoughts' and fear of crowds." (R. at 264.) He opined that Plaintiff was unable to work because he had difficulty focusing and concentrating for very long, was fearful of going outside, was suicidal at times, had difficulty sleeping, had difficulty standing for longer than twenty minutes, and had a chronically depressed mood. (*Id.*) He stated that Plaintiff had not worked since 2007 except for temporary jobs, occasionally slept at his grandmother's house, and was "otherwise on the street." (*Id.*)

### 3. Hearing Testimony

On March 24, 2009, Plaintiff, a medical expert ("ME"), and a vocational expert ("VE")

testified at a hearing before the ALJ. (R. at 29-75.) Plaintiff was represented by an attorney.

### a. Plaintiff's Testimony

The ALJ first questioned Plaintiff about Ms. Acosta's diagnosis of bipolar disorder. (R. at 31-33.) Plaintiff testified that he had been to the clinic twice but had seen her only once about four weeks before the hearing. (R. at 32-33.) Before Dallas Metrocare, he also had mental health treatment at Life Net for depression some four or five year earlier. (R. at 44.) Plaintiff was right-handed and had a tenth grade education. (R. at 38.) He had broken his left wrist in a bicycle accident in 1979, and had broken his left ankle in a car accident in 1996 or 1997. (*Id.*) He was homeless and had been living in a shelter. (R. at 46.) He sometimes stayed at a family member's house and spent some time at the Salvation Army. (*Id.*) He had been going to Alcoholic Anonymous meetings for his drinking issues and had his last drink about two months earlier. (R. at 47.) Over a year before, he would drink every day, but not when working. (R. at 48-50.) Of his forty or so jobs over the years, he had lost none due to drinking. (*Id.*) He might have lost some of his jobs because of his mental issues. (R. at 51-52.) He testified that his physical issues included a plate in his left ankle and left wrist. (R. at 52.) He had been prescribed a cane twice. (R. at 53.) He had pain issues and had to take pain medicine. (*Id.*) He could not stand on his feet for longer than twenty minutes and mostly needed to be off his feet during a full day. (*Id.*)

### b. ME's Testimony

The ME testified that Plaintiff had been treated for depression some years before but had a long period of no treatment. (R. at 55.) She noted that nothing in the October 2007 examination supported either a depressive disorder or a history of bi-polar disorder. (R. at 55.) Plaintiff took care of his personal hygiene, read the newspaper, read the Bible, watched television, fed his dog, visited his friends, went out to eat with them twice a month on average, and occasionally attempted

church.  (R. at 56.)  He went to bed late and was getting an average of about eight hours of sleep, had normal appetite and normal aspects, and had no suicidal or homicidal thoughts.  (*Id.*)  As to auditory hallucinations, Plaintiff sometimes claimed he heard his name called when he lived on the streets.  (*Id.*)  The ME testified that Plaintiff's recent evaluation of bipolar disorder was puzzling given no evidence so far of a manic episode and that Plaintiff was started on a mood-stabilizer when the appropriate approach would be to go for the psychosis first.  (*Id.*)  Upon cross-examination by Plaintiff's attorney, the ME testified that if it was truly believed that Plaintiff was bipolar I depressed, with psychotic features, then he was not being treated according to the community standard.  (R. at 60.)  The ME also testified that there was no evidence of physical cruelty to people, disregard of other people's property, lying, stealing, extortion, confrontation, fire-setting, etc., to show a personality disorder.  (R. at 61-62.)  Additionally, there was no support for the recent diagnoses because there were long periods where Plaintiff was not treated, and there was no history of hospitalizations for any psychotic, manic, or depressive episodes.  (R. at 64.)

As to his physical impairments, the ME testified that Plaintiff's left ankle had sustained some injury and undergone surgery.  (R. at 56.)  Some medical evidence showed that Plaintiff had a lot of mobility problems and needed a cane for ambulation, but there was also evidence that he was ambulatory and did not need assistance.  (R. at 57.)  He had a strong right upper extremity and could do work in a dominant position.  (R. at 58.)  He had limitations in the strength, mobility, and sensation of his left hand.  (*Id.*)  He had the ability to handle objects with his right hand and use his left hand as a helper for heavier objects.  (*Id.*)  He was unable to walk on heel to toe on the right side and on the left leg.  (*Id.*)

### c.  VE's Testimony

The ALJ asked the VE to opine whether an individual with a tenth grade education could

perform Plaintiff's past relevant work of a day laborer if he had some difficulties with reading and writing but could read the newspaper, was "limited exertionally to sedentary;" could not climb ramps, stairs, ladders, ropes, and scaffolds, could occasionally do other postural movements, was a right-handed person with a strong dexterous hand, could occasionally use the left hand for reaching, fingering, and handling; and had no mental limitations. (R. at 66.) The VE opined that such an individual could not perform the work of a landscape laborer, and with the limitations posed at the sedentary and unskilled level, was "relegated to three" jobs in the Dictionary of Occupations Titles ("DOT"). (*Id.*) These jobs consisted of the job of an election clerk with 1,694 jobs in the regional economy and 62,500 jobs in the national economy, call out operator with 2,376 jobs in the regional economy and 48,500 jobs in the national economy, and surveillance system monitor with 3,300 jobs in the regional economy and 156,219 jobs in the national economy. (R. at 66-67.)

Upon cross-examination by Plaintiff's attorney, the VE testified that in general, the jobs would require some computer use or keyboarding "which would fall out of the realm of occasional reaching, handling and fingering," especially for the surveillance system monitor job. (R. at 69.) When the attorney asked the VE to factor in the inability to do any kind of sustained keyboarding, the VE testified that "it would have a devastating effect" on the numbers for the surveillance system monitor job, and estimated "conservatively speaking" a fifty percent reduction in the number of jobs available in the regional and national economy. (R. at 69-72.) She explained that there would be at least a fifty percent reduction and "conceivably quite a larger one" in the number of jobs. (R. at 73.) She agreed with Plaintiff's attorney that the three jobs represented "a small speck of the unskilled, sedentary universe" of 137 jobs. (R. at 73-74.)

**C.    ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on June 5, 2009.

(R. at 13-25.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 31, 2007, his application date.  (R. at 18, ¶ 1.)  At step two, she found that Plaintiff's "status post remote injury of left lower extremity with metal plate in ankle, osteoarthritis of left wrist status post plate and screws, and alcohol abuse in remission" were severe impairments. (R. at 18, ¶ 2.)  At step three, she found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment.  (R. at 21, ¶ 3.)  In her residual functional capacity ("RFC") assessment, the ALJ found that the right-handed Plaintiff had the RFC to perform and sustain sedentary work with occasional balancing, stooping, kneeling, crouching, crawling squatting, and twisting, and was limited to occasional reaching, fingering and handling with his left non-dominant upper extremity.  (R. at 22, ¶ 4.)  The ALJ found that Plaintiff was unable to perform his past relevant work, but given his age, education, work experience, and RFC, could perform other jobs existing in significant numbers in the economy - those of an election clerk, call out operator and surveillance camera monitor.  (R. at 23-24, ¶¶ 5-9.)  In making this finding, the ALJ acknowledged that some of the jobs, as currently performed, might require using a computer or keyboarding, and that the occasional reaching and fingering may result in a fifty percent reduction in the number of jobs available in the regional and national economies.  (R. at 25.)  She found, however, that there were still substantial numbers of jobs available for Plaintiff to perform in both the regional and national economies.  (*Id.*)  She concluded that Plaintiff had not been disabled since March 31, 2007, the date the application was filed.  (R. at 25, ¶ 10.)

## II.  ANALYSIS

### A.    Legal Standards

#### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issue for Review**

Plaintiff presents the following issues for review:

1.    Did the ALJ accurately represent the VE's testimony?

2.    Does substantial evidence support the ALJ's finding that Plaintiff's bipolar disorder was not a severe impairment?

3.    Did the Appeals Council properly consider new and material evidence submitted with Plaintiff's Appeals Council Brief?

(P. Br. at 2.)

**C.    Issue One: VE's Testimony**

Plaintiff contends the ALJ did not meet her burden at Step five to show that Plaintiff could perform other work.  (P. Br. at 9-11.)  He argues that her Step five finding is not supported by substantial evidence because she misrepresented the VE's testimony and did not adjust the number of jobs available in the national economy.  (*Id.*)  He also argues that the ALJ's conclusion cannot be reconciled with Social Security Ruling ("SSR") 96-9p, which provides that a finding of "disabled" usually applies when the full range of work is significantly eroded.  (*Id.* at 11.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  Work exists in the national economy if it exists in significant numbers either in the region where the claimant lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A).  Jobs that are isolated and exist in only very limited numbers in relatively few locations outside of the region where a claimant lives do not qualify.  20 C.F.R. § 416.966(b).  When determining whether a claimant can perform other work, the ALJ may

rely on the medical-vocational guidelines, or if limitations make them inapplicable, on the testimony of a VE or other similar evidence. *Carey v. Apfel*, 730 F.3d 131, 145 (5th Cir.2000). A VE relies on the DOT in order to testify regarding the skills needed and the availability of specific jobs. However, the DOT "is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job." *Id.* "[A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation ." *Id.* at 146. Therefore, the VE must interpret the DOT and make adjustments to fit a particular claimant. *Williams v. Astrue*, 2008 WL 4490792, at *13 (N.D. Tex. Oct. 3, 2008). Accordingly, the ALJ must rely upon the VE to make adjustments to the availability of jobs based on a particular claimant's skills and abilities. *Id.*

Here, the ALJ determined that Plaintiff could perform and sustain sedentary work with no climbing, only occasional balancing, stooping, kneeling, crouching, crawling, and twisting, and only occasional reaching, fingering and handling with his left non-dominant upper extremity. The VE opined that an individual with this RFC could perform the jobs of an election clerk, a call out operator, and a surveillance system monitor, but conservatively estimated that the limitations in the individual's left upper extremity would result in at least a fifty percent reduction and "conceivably quite a larger one" in the number of jobs in the regional and national economies. The ALJ acknowledged this testimony in her written decision, and concluded that even with that reduction, a substantial number of jobs would be available for claimant in both the regional and national economies. Although the ALJ did not specify the resulting numbers, the fifty percent reduction in the total number of jobs available for all three positions amounts to 3,685 in the regional economy and 133,609 in the national economy. The ALJ did not misrepresent the VE's testimony in her

written decision.

Further, substantial evidence supports the ALJ's finding that a significant number of jobs were available even with the fifty percent reduction. There is no bright line rule to determine what constitutes a significant number of jobs. *See Thompson v. Astrue*, 2010 WL 2816677, at *7 (N.D. Tex. June 17, 2010). Each case is evaluated on its individual merits taking into account factors such as (1) the level of the claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the reliability of the claimant's testimony; (4) the distance the claimant is capable of traveling for work; (5) the types and availability of such work; and (6) the isolated nature of the jobs. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988); *Thompson*, 2010 WL 2816677, at *7. "The decision should ultimately be left to the trial judge's common sense in weighing statutory language as applied to a particular claimant's factual situation." *Id.* Here, the ALJ's step five finding incorporated all of Plaintiff's limitations and the VE's testimony, and was based on proof of at least 3,685 jobs in the regional economy and 133,609 jobs in the national economy for the three positions available to Plaintiff. The finding was therefore supported by substantial evidence.

Plaintiff argues that the ALJ's finding is inconsistent with SSR 96-6p. While SSR 96-6p states that a finding of "disabled" *usually* applies when the full range of work is significantly eroded, it does not require such a finding. 1996 WL 374185, at * 3. The ruling goes on to state that "the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability" and there may be a number of occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with an eroded sedentary occupational base. *Id.* at * 4. Since the ALJ found that Plaintiff could perform jobs existing in significant numbers, her finding was not inconsistent with SSR 96-6p.

In sum, the ALJ's step five finding is supported by substantial evidence and remand is not required on this issue.

**D.**     **Issue Two: Bipolar Disorder**

The second issue is whether substantial evidence supports the ALJ's finding that Plaintiff's bipolar disorder was not a severe impairment.  (P. Br. at 12-16.)  Plaintiff argues that the ALJ improperly favored the opinion of a non-examining medical expert who did not review his actual treatment records and was not present at the hearing.  (*Id.* at 12-14.)  He also argues that the ALJ failed to correctly identify his bipolar disorder as a severe impairment under the standard set forth in *Stone v. Heckler*, 753 F.2d 1099 (5th Cir. 1985).  (*Id.* at 15.)  Finally, he contends that the ALJ did not use the special technique for evaluating mental impairments under 20 C.F.R. § 416.1920a(c)(3).  (*Id.* at 15-16.)

Pursuant to the social security regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  In the Fifth Circuit, an impairment is considered not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985).  To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used."  *Id.* at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at

*6 (N.D. Tex. Aug. 29, 2001). Because the hearing decision in this case specifically cites *Stone*, the issue is whether substantial evidence supports the ALJ's finding that plaintiff's bipolar disorder was not severe. *See Musgrove v. Astrue*, 2009 WL 3816669 at *3 (N.D. Tex. Nov.13, 2009).

Here, the ALJ acknowledged Plaintiff's diagnosis of a bipolar disorder, but found that the impairment was non-severe. (R. at 20-21.) The ALJ's finding of non-severity was based on a psychological evaluation by Dr. Hellyer, a consultative psychologist examiner who opined that there was a lack of sufficient evidence of symptoms of a depressive disorder. (R. at 19.) Her finding was also based on the hearing testimony of the ME, who opined that the medical evidence of record did not support a diagnosis of bipolar disorder because Plaintiff had long periods of no treatment, there was no history of hospitalizations for any psychotic, manic, or depressive episodes, and the treatment at Dallas Metrocare for Plaintiff's bipolar disorder was not according to the community standard. (R. at 19-20; 55-64.) In making her finding, the ALJ applied the special technique set out in 20 C.F.R. § 416.920a for assessing the severity of a mental impairment. (R. at 21.) She specifically considered the four broad functional areas set out in the regulation for evaluating mental disorders: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 41.920a(c)(3).

As to activities of daily living, she found that Plaintiff had no limitation because he cared for his personal hygiene, dressed himself, cared for his dog, and heated food in the microwave. (R. at 21.) She also found that he had no limitations in social functioning because he went out to eat or watch movies with his friends, occasionally attended church, was friendly and talkative, and exhibited an average range of affect, euthymic mood, and normal speech. (*Id.*) She further found that Plaintiff had no limitation in the area of concentration, persistence or pace because he read the

- 15 -

Bible and the newspaper, watched television and fed the dog, his general knowledge was below average but he could generalize from a proverb and categorize, his comprehension was normal, and his memory was in tact. (*Id.*) Finally, she noted that Plaintiff had experienced no episodes of decompensation of extended duration. (*Id.*) She then found that Plaintiff's bipolar disorder was not severe. *See* 20 C.F.R. § 416.920a(d)(1). Her finding that Plaintiff's bipolar disorder was not severe was therefore supported by substantial evidence.

Plaintiff argues that the ALJ improperly favored the opinion of a non-examining medical expert who did not review his actual treatment records and was not present at the hearing over the findings of his treating physicians at Dallas Metrocare. (P. Br. at 10-12.) The ALJ did not ignore the medical evidence from Dallas Metrocare, but relied on it to find that Plaintiff had the medically determinable impairment of bipolar disorder. (R. at 20-21.) Additionally, the ALJ did not rely on the testimony of the ME alone, but also on medical notes from the examining psychologist to find that the impairment was not severe. (R. at 19-21.) Finally, while the ALJ should accord great weight to the opinion of a treating physician, the opinion of any physician, including a treating physician, may be rejected if the evidence supports a contrary conclusion or is inconsistent with other substantial evidence of record. *See Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987); *Spellman v. Shalala*, 1 F.3d 357, 364-65 (5th Cir. 1993). The ALJ's finding of non-severity was supported by substantial evidence and remand is not required on this issue.

**E.  Issue Three: New Evidence**

Plaintiff lastly argues that the Appeals Council failed to properly and specifically evaluate new and material evidence submitted to it. (P. Br. at 16-19.) Plaintiff contends that the evidence – Dr. Bellamy's assessment of how his bipolar disorder affected his ability to work – would have

changed the outcome of the case. (*Id.* at 18.)

If a claimant submits new and material evidence which relates to the period before the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review of an ALJ's decision. 20 C.F.R. § 404.970(b). Evidence submitted for the first time to the Appeals Council is considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering that final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281-82 (5th Cir. 2006).

Here, the Appeals Council did not specifically address the additional evidence in reviewing the ALJ's decision. (R. at 4.) Even though an internal Appeals Council manual, the Hearings, Appeals and Litigation Law Manual ("HALLEX"), requires the Council to specifically address the additional evidence and legal arguments submitted in her request for review, the requirement has been temporarily suspended by a memorandum from the Executive Director of Appellate Operations, dated July 20, 1995. *See Newton v. Apfel*, 209 F.3d 448 (citing HALLEX §§ I-3-501); *Higginbotham*, 405 F.3d at 335 n.1.[2] The issue therefore is whether the new evidence diluted the record to such an extent that the ALJ's determination became insufficiently supported.

Dr Bellamy opined that Plaintiff's bipolar disorder II appeared "to be long standing, dating perhaps to childhood" and that he was unable to work because he had difficulty focusing and concentrating for very long, was fearful of going outside, was suicidal at times, had difficulty

---

[2] There is no indication that the suspension has been lifted. *McGee v. Astrue*; 2009 WL 2841113, at *5 (W.D. La. Aug. 28, 2009).

sleeping, had difficulty standing for longer than twenty minutes, and had a chronically depressed mood.  (R. at 264.)  He pointed out that Plaintiff had not worked since 2007 except for temporary jobs, slept at his grandmother's house occasionally, and was "otherwise on the street."  (*Id.*)  While this statement assesses Plaintiff's ability to work, it does not dilute the record to such an extent that the ALJ's decision becomes insufficiently supported.  As pointed out by the Commissioner, much of the record indicates that Plaintiff denied any mental problems (R. at 164), sought no treatment for a mental disorder (R. at 207, 259, 55), and manifested no symptoms of a mental disorder affecting his ability to work (R. at 55-56, 153, 191, 207-208, 235, 241, 244, 247, 250, 259).  Since the ALJ's decision is sufficiently supported, remand is not required on this issue.

## III.    CONCLUSION

Defendant's motion for summary judgment should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED,** on this 7th day of January, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE